**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS
LIABILITY LITIGATION

Case No. 3:19md2885

This Document Relates to:
*Beal*, 7:20cv0006

Judge M. Casey Rodgers
Magistrate Judge Gary R. Jones

**ORDER**[1]

This Order resolves the parties' respective omnibus motions to exclude expert testimony and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), for the Group D case of Plaintiff James Beal. *See* ECF Nos. 84, 90.

## I.  Legal Standard

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony.  *Id.* (quoting *Daubert*, 509 U.S. at 589). Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record.  Thus, this Order sets out only what is necessary to explain the Court's rulings.

matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met. *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*"). Importantly, if a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). The qualifications standard for expert testimony is "not stringent" and "[s]o long as the

witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62. The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341. The court's focus must be on the expert's principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect of the proposing

party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded). "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming," or if it is otherwise unfairly prejudicial. *Id*. "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id*. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, . . . district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II.    Beal's Experts

Defendants move to exclude various case-specific opinions of Drs. Christopher Spankovich and Mark Packer.  Briefly, each expert relied primarily on the differential etiology method to link Beal's injuries to an alleged defect in the CAEv2.  "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix II*, 609 F.3d at 1195.  "A reliable differential etiology is performed in two steps." *Id*.  "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration."  *Id*. (internal quotes omitted).  "Second, the expert must eliminate all causes but one" by "appl[ying] the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms."  *Id*. at 1197.  The expert must provide scientifically reasoned explanations for rejecting alternative hypotheses, and "the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation."  *Id*.  While a "differential analysis need not rule out all possible alternative causes, [ ] it must at least consider other factors that could have

been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1309 (11th Cir. 2014) (internal quotes omitted).

Defendants argue that Drs. Spankovich and Packer: (1) lack a reliable basis for ruling in the CAEv2 as a cause of Beal's injuries; (2) failed to reliably rule out non-military noise exposure, other hearing protectors, ototoxins, and head injuries; and (3) lack a reliable basis for attributing sleep difficulties or mental health symptoms to any alleged auditory injuries.[2]  The Court disagrees.

First, both doctors articulated reliable bases for ruling in the CAEv2's alleged defects as the cause of Beal's injuries.  They explained that various aspects of the CAEv2's design prevent proper fit and seal (e.g., hard, inflexible stem and opposing flanges contacting the tragus), and that these alleged design defects present a risk of auditory injury to users.  *See, e.g.*, Spankovich Rep. (Beal), ECF No. 118-5 at 14-15; Packer Rep. (Beal), ECF No. 118-4 at 28; Packer Rep. (General), ECF No. 1631-23 at 82-84.  Based on a visual examination of Beal's ears and tympanometry measurements, the doctors concluded that Beal has an average-sized ear canal, and from viewing the

---

[2] Defendants also seek exclusion of any opinions related to hidden hearing loss ("HHL") and about whether Beal's auditory issues "exacerbate his mental health."  *See* Def. Motion, ECF No. 84-12 at 7-8.  These aspects of Defendants' motion are denied as moot.  Plaintiffs represent that they do not intend to offer evidence at trial that Beal suffers from HHL or that Beal's auditory injuries exacerbate his diagnosed mental health conditions.  To be clear, these rulings do not preclude either Dr. Spankovich or Dr. Packer from offering the results of Beal's otoacoustic emissions testing and/or other diagnostic measures beyond the pure-tone audiogram as evidence of cochlear pathology.  Nor does it preclude either doctor from discussing any properly disclosed opinions as to the impact of Beal's hearing loss and/or tinnitus on his garden-variety stress and anguish, as well as quality of life issues.

CAEv2 inserted in Beal's ear, they observed that the CAEv2's outer flanges compressed against Beal's tragus and conchal wall.[3] Dr. Spankovich also noted that Beal reported instances where the CAEv2 perceptibly loosened in his ear, Spankovich Dep., ECF No. 118-3 at 57, and, from a review of Beal's medical history and noise exposures, both determined that the onset of his auditory symptoms coincided temporally with his use of the CAEv2, *see* Spankovich Rep., ECF No. 118-5 at 6 & 9; Packer Rep., ECF No. 118-4 at 19. This evidence—that is, evidence that Beal's ear canal is the same size that allegedly presented fit problems during Defendants' testing of the CAEv2, that Beal actually experienced at least two of the alleged fit defects while wearing the CAEv2, and that there is a temporal relationship between the onset of Beal's injuries and his use of the CAEv2—provides a reliable basis for the doctors' opinions that the CAEv2 did not provide adequate fit and seal for Beal, resulting in noise-induced hearing loss. The fact that neither doctor took molds/digital impressions of Beal's ear canal or generate a personal attenuation rating may bear on the weight of their respective opinions, but not admissibility.

Both doctors also adequately considered and ruled out Beal's use of other hearing protectors and non-military occupational and/or recreational noise exposure. According to Dr. Spankovich, Beal's military entrance audiograms (which followed pre-military, unprotected noise exposures while hunting) reflected "slightly elevated

---

[3] Dr. Packer personally observed Beal insert the CAEv2 into his ears and photographed its placement. Dr. Spankovich reviewed Dr. Packer's photographs of the CAEv2 in Beal's ears.

thresholds" at certain frequencies, some of which improved in subsequent testing. Spankovich Dep., ECF No. 118-3 at 77-78.   However, Beal exclusively wore the CAEv2 while serving in the military from 2005 through July 2011, and it was during that period that he was exposed to substantial military noise, experienced "a large shift" in his hearing, and first perceived the onset of tinnitus.   *See id*. at 79.   In Beal's post-military years, he has worn foamies and earmuffs for sporadic recreational noise exposures (and double protection for recreational shooting), no hearing protection while driving semi-trailer trucks, and the Moldex triple-flange earplug while working as a machine operator.   There is no evidence that any of the other hearing protectors worn by Beal after the CAEv2 were defective or otherwise failed him, and there has only been "negligible" change (and even "some slight improvement) in Beal's hearing sensitivity since leaving the military.   *See id*. at 100, 160.   Dr. Packer reached substantially the same conclusions for substantially the same reasons.[4]   Having identified a temporal relationship between the cause and effect of Beal's alleged injuries, and offered more than "unsupported speculation" as a basis for ruling out other hearing protectors and non-military noise, Drs. Spankovich and Packer's analyses satisfy Rule 702 and *Daubert*.   *See Hendrix II*, 609 F.3d at 1197.

---

[4] *See, e.g.*, Packer Rep., ECF No. 118-4 at 30-31 (pre- and post-military noise exposures, other hearing protectors); *id*. at 19 (tinnitus onset and worsening occurred while Beal was exposed to military noise wearing the CAEv2); Packer Dep., ECF No. 118-9 at 77 (Beal used CAEv2 "exclusively during his military service"); *id*. at 115-19 (audiograms reflect progressive worsening of Beal's hearing throughout military service and "pretty stable hearing thresholds" thereafter); *id*. at 124-26 (same).

The same is true for the doctors' consideration of Beal's head injuries.[5]  Both Dr. Spankovich and Dr. Packer reviewed Beal's history of head trauma and blast exposures, interviewed him about the incidents at length, and concluded that Beal never suffered head trauma of a nature and severity capable of producing his "peripheral cochlear pathology," hearing loss, and permanent tinnitus.  *See* Spankovich Dep., ECF No. 118-3 at 148; Packer Rep., ECF No. 118-4 at 28-29; Packer Dep., ECF No. 118-9 at 138-45.  Moreover, both of Beal's "mild" head injuries occurred after he first began experiencing tinnitus.  *See* Spankovich Rep., ECF No. 118-5 at 16; Packer Dep., ECF No. 118-4 at 138.  In the doctors' views, the high-level sound noise from the blast incidents—from which Beal should have been adequately protected by the CAEv2, but was not—exacerbated Beal's tinnitus, but there was no head injury that induced or worsened his auditory symptoms.  *See, e.g.*, Spankovich Dep., ECF No. 118-3 at 147-51; Packer Rep., ECF No. 118-4 at 29; Packer Dep., ECF No. 118-9 at 49, 54-56, 144-47.  Based on the nature and timing of Beal's prior head trauma/blast exposures and his auditory injuries, Dr. Spankovich and Packer's conclusions that his head injuries could not have caused his auditory damage are adequately supported by the record.

---

[5] In their briefing, Defendants incorporated their Group C Daubert argument that Dr. Spankovich is not qualified to rule out prior head injuries as a cause of a plaintiff's hearing problems. For the reasons stated in the Court's first Daubert Order for Group C, ECF No. 2218 at 7-8, which are incorporated by reference here, Dr. Spankovich is "amply qualified" to offer general opinions regarding whether head injuries commonly cause hearing problems and specific opinions on the relationship, if any, between Beal's alleged head injuries and his hearing problems.

Both doctors also provided scientifically reasoned explanations for their respective opinion that tinnitus "significantly contributes to [Beal's] sleep difficulties." *See* Spankovich Dep., ECF No. 118-3 at 174; see also Packer Rep., ECF No. 118-4 at 20 ("[Beal's] tinnitus makes it difficult to sleep.").  More specifically, Drs. Spankovich and Packer drew on their own clinical experience treating and managing symptoms of tinnitus patients, together with an explanation of how that experience informed their opinions, as well as scientific literature linking tinnitus with sleep difficulties.  Neither doctor quantified the exact number of hours of sleep that Beal loses to tinnitus, as opposed to other factors, but that has no bearing on the reliability of their specific causation opinions.  Both doctors properly focused on the nature of Beal's reported sleep symptoms—i.e., his inability to fall asleep because of his tinnitus—and how those symptoms differ from the kinds of symptoms associated with other causes of sleep difficulties, such as PTSD, nightmares, pain, asthma, or apnea.  *See* Spankovich Dep., ECF No. 118-3 at 168-76; Packer Dep., ECF No. 118-9 at 149-51.  This satisfies Rule 702 and *Daubert*.

Last, Defendants argue that Drs. Spankovich and Packer offered no reliable methodology for ruling out Beal's alcohol consumption, and his exposure to JP-8 and carbon monoxide, as a cause of his auditory injuries.  The Court has repeatedly found that no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between noise-induced sensorineural hearing loss/tinnitus and alcohol consumption or chemical exposures.  *See, e.g.*, *In re 3M*, 3:19md2885, ECF

Nos. 2218 at 32-34 & 1330 at 8-9.  None of the materials cited in connection with the instant briefing compel a contrary conclusion.  Because the scientific landscape remains largely unchanged since the Court last ruled on this issue, alcohol and chemical exposure opinions from either side remain inadmissible on reliability, helpfulness, and 403 grounds.  *See id*.

## III.  Defendants' Experts

Beal moves to exclude certain opinions offered by Drs. James Crawford, Gregory Flamme and Mark Stephenson ("Flamme-Stephenson"), and Derek Jones and Jennifer LaBorde ("Jones-LaBorde").

### A.  Dr. James Crawford

Plaintiffs challenge several aspects of Dr. James Crawford's opinions that Beal's hearing loss and tinnitus were not caused by the CAEv2.

#### 1.  Design Defect

Plaintiffs argue that Dr. Crawford cannot opine on whether the CAEv2 is defective, or whether its alleged defects contributed to Beal's hearing damage, because he never examined the product's design and thus has no basis on which to offer opinions regarding alleged defects.  Consistent with prior rulings on this issue, which are incorporated by reference here, the Court agrees in part.  *See, e.g.*, *In re 3M*, No. 3:19md2885, ECF No. 2845 at 21-22; *id.*, ECF No. 2218 at 41-42.  Dr. Crawford previously acknowledged that he has never reviewed any information about the CAEv2's design, testing, efficacy, marketing, or sale in connection with his work in

this case. *See id*. Therefore, he may not offer opinions in those areas or otherwise base his causation opinions on them. *See id*. Nonetheless, Dr. Crawford may explain why he concluded that Beal's auditory injuries are not attributable to the CAEv2 based on record evidence regarding Beal's noise exposures, other potential causes of auditory damage, and the timeline of any alleged injuries.

### 2. Head trauma/TBI

Dr. Crawford's opinion that head trauma/TBI cannot be ruled out as a cause of Beal's auditory injuries satisfies Rule 702 and *Daubert*, for the most part. Testimony regarding pre-military head trauma is excluded on helpfulness and 403 grounds, given Dr. Crawford's opinion that pre-military head trauma did not cause or contribute to Beal's auditory injuries. *See* Crawford Dep., ECF No. 90-5 at 28. Military head trauma, however, is fair game. Scientific literature supports the proposition that head trauma can cause auditory dysfunction, and Dr. Crawford provided scientifically reasoned explanations for ruling in Beal's "multiple head traumas" during military service as a cause of his hearing loss and tinnitus. *See* Crawford Rep., ECF No. 90-4 at 15. Plaintiffs' disagreement with Dr. Crawford's assessment of the severity and/or long-term impact of Beal's military head trauma, and their observations about apparent inconsistencies between Dr. Crawford's deposition testimony and statements in his expert report on various matters, are more appropriately addressed through cross-examination and competing expert testimony. *See Quiet Tech*., 326 F.3d at 1345; *Gonzalez v. Inman Trucking, Inc*., No. 3:16cv006, 2017 WL 7905499, at *5 (W.D. Tex.

June 20, 2017) ("The fact that [an expert] arguably contradicted himself during his deposition does not bear upon the admissibility of his testimony, but upon his credibility, which is a jury determination."); *Exim Brickell LLC v. Bariven*, No. 1:09cv20915, 2011 WL 13131317, at *5 (S.D. Fla. Mar. 11, 2011) (same as to arguable contradictions between deposition testimony and written reports).

### 3.    Otitis media and non-occupational noise[6]

Regarding otitis media and non-occupational noise during military service as potential causes of Beal's hearing loss, Dr. Crawford's opinions are admissible.  To the extent those opinions may contradict his opinion that Beal suffered no decline in hearing while in the military, that is a matter for cross-examination and argument.  *See Gonzalez*, 2017 WL 7905499, at *5; *Exim Brickell*, 2011 WL 13131317, at *5.

### 4.    Central Auditory Processing Disorder (CAPD)

Dr. Crawford's CAPD opinion lacks a reliable methodological basis.[7]   As discussed in a prior order, which is incorporated by reference here, CAPD is a deficit in the brain's ability to filter and interpret incoming auditory signals, and it can occur as a result of blast-related traumatic brain injuries.  *See In re 3M*, No. 3:19md2885, ECF No. 2845 at 28-29.  "Notably, there are tests for CAPD that help identify 'the

---

[6] Ototoxic exposures during military service are excluded on other grounds, as discussed in Sections II and III(A)(5) of this Order.

[7] No medical professional has ever diagnosed Beal with CAPD.

nature and severity of' a patient's specific auditory processing deficits." *See id*.[8]  Dr. Crawford, however, did not perform, request, or review CAPD testing for Beal, and his report does not even acknowledge that CAPD testing is available.  *See* Crawford Rep., ECF No. 90-4 at 14.  And he did not specifically analyze Beal's alleged blast exposures, brain injuries, and auditory symptoms relative to the diagnostic characteristics and presenting symptoms of CAPD.  *See id*.  Consequently, Dr. Crawford's CAPD-opinion is wholly speculative and unhelpful, with only nominal relevance, which is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

### 5.    Ototoxic agents

As already discussed, and incorporated by reference here, no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between noise-induced sensorineural hearing loss/tinnitus and burn pits, JP8 and other fuels, smoke from oil fires, fuel exhaust, other chemical exposures (e.g., carbon monoxide, metal-working fluids, paints, "dust-off" cleaner), sand, dust, cigarette smoke, alcohol, and nonspecific painkillers.  *See, e.g.*, *In re 3M*, 3:19md2885, ECF Nos. 2218 at 32-34 & 1330 at 8-9.  Consequently, Dr. Crawford's opinions regarding these substances are excluded on reliability, helpfulness, and 403 grounds.

---

[8] *See also* Michael Oleksiak et al., *Audiological issues and hearing loss among Veterans with mild traumatic brain injury*, 49 J. REHAB. RSCH. & DEV. 995 (2012), ECF No. 2816-66 at 6, 8.

### 6.    Steady-state noise as cause of tinnitus

Dr. Crawford's expert report states that Beal's exposure to high levels of steady state noise during his military service cannot be ruled out as a cause of his tinnitus. *See* Crawford Rep., ECF No. 90-4 at 15.  However, at Dr. Crawford's deposition, he agreed that Beal "was adequately protected" by the CAEv2 during those steady state noise exposures, and testified that where someone is adequately protected against high levels of steady state noise, he "wouldn't say that those steady state noises would have contributed to his tinnitus." *See* Crawford Dep., ECF No. 90-5 at 28-29.  The parties dispute whether Dr. Crawford's deposition testimony amounts to a retraction of his opinion that steady state noise may have caused or contributed to Beal's tinnitus.  The Court views this dispute as presenting fodder for cross-examination and argument, rather than a basis for exclusion for Dr. Crawford's steady-state noise opinion. *See Gonzalez*, 2017 WL 7905499, at *5; *Exim Brickell*, 2011 WL 13131317, at *5.

### B.    Flamme-Stephenson

Drs. Gregory Flamme and Mark Stephenson co-authored a case-specific report for Beal.

### 1.    Army Hearing Conservation Program

Consistent with prior rulings on the issue, which are incorporated by reference here, Flamme-Stephenson may not offer testimony suggesting that Beal's hearing impairments were the result of inconsistent implementation of the military's hearing conservation programs. *See In re 3M*, ECF No. 2218 at 30-31 (collecting rulings).  As

audiologists, Flamme-Stephenson may speak about the importance of training on and fitting of earplugs. *See id*. Additionally, they may note the absence of an annual audiogram for a particular year in Beal's military's health records. *See In re 3M*, 3:19md2885, ECF No. 2845 at 24. However, they are not permitted to suggest, even subtly, that the military's failure to conduct an annual audiogram, its failure to provide "adequate and effective training," its "poor safety culture," or it the fact that it does not require audiometric testing at or above 8 kHz, contributed in any way to Beal's injuries, as there is no medical evidence to support those opinions. *See id*. And Flamme and Stephenson may not both testify about the same things – cumulative.

### 2.      Head trauma

Flamme-Stephenson's opinions regarding head trauma are admissible, in part. More specifically, as to pre-military head trauma, Flamme-Stephenson may reference the reported facts related to Beal's three childhood head injuries, to the extent those facts bear on their allowable case-specific opinions here. However, they may *not* characterize the childhood injuries as "TBI events" or concussions (except where Beal himself or a medical record did so), and they may not otherwise diagnose the injuries as a medical condition under any guidelines or diagnostic criteria. *See* Flamme-Stephenson Rep., ECF No. 90-6 at 22, 55-56. Flamme-Stephenson are not physicians or neurotrauma specialists, and are thus wholly unqualified to diagnose traumatic brain injuries/concussions in connection with their opinions. *See In re 3M*, 3:19md2885, ECF No. 2845 at 26.

As to their broader opinions, the doctors did provide scientifically reasoned explanations for ruling in head trauma as a potential cause of Beal's tinnitus.[9]  *See* Flamme-Stephenson Rep., ECF No. 90-6 at 55-56, 60-61.  They did not, however, disclose any opinion ruling in head trauma as a cause of Beal's hearing loss or articulate an evidentiary basis for any such opinion.  *See, e.g.*, *id*. at 3-62.  Indeed, their scientific analysis of head trauma in the context of the facts of Beal's case is tied only to tinnitus, presumably because of their related opinion that Beal's hearing loss manifested in the first instance only after he left the military, which was years after the incidents of head trauma occurred.  Whatever Flamme-Stephenson's rationale, they did not disclose a scientifically reasoned opinion that Beal's hearing loss may be caused by head trauma.  Consequently, they may not offer any such opinion at trial.

### 3.    JP-8 or other fuels, fumes, smoke, inhalant abuse, tobacco use

As already discussed, and incorporated by reference here, no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between noise-induced sensorineural hearing loss/tinnitus and JP8 and other fuels, vehicle or truck exhaust fumes, smoke from oil fires or rubber, other chemical exposures (e.g., carbon monoxide, metal-working fluids, paints, "dust-off" cleaner),

---

[9] Flamme-Stephenson are expressly prohibited from improperly commenting on Beal's credibility or suggesting that Beal is malingering and/or exaggerating his injuries for purposes of this litigation. *See, e.g.*, Flamme-Stephenson Rep., ECF No. 90-6 at 54 ("The inconsistency between Mr. Beal's reports of tinnitus prior to and after joining this litigation suggests that it did not regularly draw his attention until joining this litigation.").

sand, dust, or tobacco use.  *See, e.g.*, *In re 3M*, 3:19md2885, ECF Nos. 2218 at 32-34 & 1330 at 8-9; *Wilkerson v. 3M*, 7:20cv035, ECF No. 116 at 7.  Consequently, Flamme-Stephenson's opinions regarding these substances are excluded on reliability, helpfulness, and 403 grounds.

### 4.    Effective quiet & bone/tissue conduction

As with prior bellwether plaintiffs, Flamme-Stephenson opine that they cannot rule out that Beal's ears did not have "sufficient time to recover" between temporary threshold shifts caused by "simultaneous and sequential" noise exposures in military and civilian roles, which could have exacerbated the hazard posed by subsequent exposures to noise.  *See* Flamme-Stephenson Rep., ECF No. 90-6 at 30.  The Court has previously found that Flamme-Stephenson's so-called "effective quiet" opinion lacks a reliable scientific basis, *see In re 3M*, 3:19md2885, ECF No. 2218 at 38-39, and now incorporates that ruling by reference in Beal's case.  Because Defendants have not offered any new scientific evidence that would justify reconsideration of the prior ruling, Flamme-Stephenson's effective quiet opinion is excluded.

Flamme-Stephenson's bone/tissue conduction opinions are excluded for the same reasons.  The Court has already found that those opinions lack a reliable scientific basis, *see id*. at 36-38 & ECF No. 2845 at 25, and now incorporates those ruling by reference in Beal's case.

### C.    Jones-LaBorde

Drs. Derek Jones and Jennifer LaBorde also co-authored a case-specific report for Beal.

### 1.    LaBorde's personal use testimony

Consistent with the Court's prior rulings on this issue, which are incorporated by reference here, Dr. LaBorde may not offer testimony that improperly bolsters her properly disclosed expert opinions by reference to her personal experiences using hearing assistive devices and/or the impact of her own hearing impairments on her daily life. *See In re 3M*, 3:19md2885, ECF No. 2845 at 31; *Wilkerson*, 7:20cv035, ECF No. 116 at 4-5. Personal use testimony of this nature is not based on scientific principles, reasoning, or methodology, and it is irrelevant, unhelpful, and unfairly prejudicial in the context of this litigation. *See Wilkerson*, 7:20cv035, ECF No. 116 at 5. With that said, limited background testimony that a witness's own hearing loss and/or tinnitus led them to the field of audiology will be permitted, if both sides agree on the issue. *See id*. In other words, either both sides may do so or neither may do so. *See id*. Regardless, no witnesses will be permitted to delve into the details of their own hearing impairments, any impact of those impairments on their daily lives, or the extent to which hearing assistive devices ameliorate their experience.

### 2.    Factors not addressed in the differential diagnosis

Plaintiffs argue that opinions involving potential causes of Beal's auditory injuries that were not addressed in Jones-LaBorde's differential analysis should be

excluded, including opinions regarding exposure to recreational noise (e.g., concerts, firecrackers, and car racing) and occupational noise (e.g., power tools).[10]  The Court agrees, in part.  To the extent that Jones-LaBorde did not affirmatively disclose—either in their expert report or at their respective depositions in Beal's case—a scientifically reasoned explanation why a particular factor cannot be ruled out as a cause of Beal's auditory injuries, they are precluded from offering any such testimony about the factor at trial.  *See Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966) ("The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush.").  Summaries of historical facts alone, unaccompanied by a differential analysis of their significance in a plaintiff's case, do not satisfy the reliability and helpfulness standards for expert opinions on causation.  *See, e.g.*, *In re 3M*, 3:19md2885, ECF No. 1910 at 34-35 (excluding expert who "summariz[ed] [the plaintiff's] service and medical history" but failed to "demonstrably identify and rule out alternative potential causes of" the plaintiff's auditory symptoms); *id.*, ECF No. 1680 at 24 (excluding defense expert's causation opinion for failure to consider and rule out potential causes of the plaintiff's auditory injuries).

Here, Jones-LaBorde did adequately disclose and support their opinions that pre-military recreational noise (while hunting) cannot be ruled out as a cause of Beal's mild

---

[10] Plaintiffs raise the same challenge with respect to any opinions regarding alcohol, tobacco, painkillers, and "dust off" cleaner.  The Court need not address this challenge because all causation opinions related to those substances are excluded on other grounds elsewhere in this Order.

hearing loss when he joined the Army.  *See* Jones-LaBorde Rep., ECF No. 90-9 at 14. The pre-military recreational noise opinion is thus admissible.  Nowhere in the doctors' expert report, however, do they demonstrably opine and explain why power tools and sporadic recreational noise (i.e., concerts, firecrackers, car racing) cannot be ruled out as potential causes of Beal's auditory injuries.  Having failed to disclose and support opinions on those factors, Jones-LaBorde may not newly disclose and support those opinions at trial.[11]

### 3.  Ototoxic exposures & ear infections

As already discussed, and incorporated by reference here, no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between noise-induced sensorineural hearing loss/tinnitus and alcohol abuse, tobacco, nonspecific painkillers, or chemical exposures (including "dust-off" cleaner).  *See, e.g.*, *In re 3M*, 3:19md2885, ECF Nos. 2218 at 32-34 & 1330 at 8-9; *Wilkerson v. 3M*, 7:20cv035, ECF No. 116 at 7.  Consequently, Jones-LaBorde's opinions regarding these substances are excluded on reliability, helpfulness, and 403 grounds.

Regarding ear infection(s), Jones-LaBorde cited "various" reports of ear infections "throughout" Beal's medical records, and two documented incidents of negative middle ear pressure (once in April 2012, and once in January 2022), as temporally related Beal's first experience of "constant tinnitus."  *See* Jones-LaBorde

---

[11] The full deposition transcripts for Drs. Jones and LaBorde were not provided in connection with the instant briefing.

Rep., ECF No. 90-9 at 15, 18. In their view, those records and the variability in Beal's pure-tone thresholds, also implicate the possibility that Eustachian tube dysfunction is "contribut[ing]" to any hearing loss. *See id*. at 15. This is a minimally adequate basis for ruling in ear infections/middle ear problems as a potential cause of Beal's auditory symptoms. To the extent this opinion may contradict Jones-LaBorde's opinion that Beal suffered no "materially significant change" in hearing during his military service, that is matter for cross-examination and argument. *See Gonzalez*, 2017 WL 7905499, at *5; *Exim Brickell*, 2011 WL 13131317, at *5.

### 4.     Head trauma

Jones-LaBorde's opinions that head trauma cannot be ruled out as a cause of Beal's hearing difficulties are supported by a minimally sufficient evidentiary basis. *See* Jones-LaBorde Rep., ECF No. 90-9 at 16-17, 20. The apparent contradiction between this opinion and the doctors' opinion that Beal did not experience material hearing threshold changes during his military service is appropriately addressed through cross-examination and argument. *See Gonzalez*, 2017 WL 7905499, at *5; *Exim Brickell*, 2011 WL 13131317, at *5.

### 5.     CAPD

Jones-LaBorde's CAPD opinion lacks a sufficiently reliable methodological basis. Again, No medical professional has ever diagnosed Beal with CAPD. There are tests for CAPD, yet Jones-LaBorde did not perform, request, or review any such testing. They discuss Beal's blast exposures and his related TBI symptoms, but as with

Dr. Crawford, they do not analyze Beal's auditory symptoms relative to the diagnostic characteristics and presenting symptoms of CAPD.  *See, e.g.*, Jones-LaBorde Rep., ECF No. 90-9 at 16-17.  Consequently, Jones-LaBorde's CAPD-opinion is conclusory, speculative, and unhelpful, with only nominal relevance, which is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  It is excluded on that basis.

## IV.   Conclusion

Based on the foregoing, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert* in the Trial Group D case for Beal, ECF Nos. 84 and 90, are **GRANTED IN PART and DENIED IN PART**, consistent with this Order.

**SO ORDERED**, on this 28th day of April, 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**